# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

**WILLIAM J. HOWELL, SR.,**

    **Plaintiff,**

v.                                     **Civil Action 2:17-cv-409**
                                                **Chief Judge Algenon L. Marbley**
                                                **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, William J. Howell, Sr., filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his Title II Disability Insurance Benefits application. For the reasons that follow, it is **RECOMMENDED** that Plaintiff's Statement of Errors be **OVERRULED**, and that judgment be entered in favor of Defendant.

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff filed for disability insurance benefits ("DIB") on February 7, 2013, alleging a disability onset date of November 4, 2010. (*See* Doc. 11-3, Tr. 74, PAGEID #: 123). His application was denied initially on June 13, 2013 (Doc. 11-4, Tr. 103, PAGEID #: 154), and upon reconsideration on October 30, 2013. (*Id.*, Tr. 111, PAGEID #: 161). Administrative Law Judge Kevin J. Detherage (the "ALJ") held a hearing on October 1, 2015 (Doc. 11-2, Tr. 27, PAGEID #: 75), after which he denied benefits in a written decision (Doc. 11-2, Tr. 8–26, PAGEID #: 56–74). Following the hearing, Plaintiff's disability onset date was amended to July 8, 2015. (Doc. 11-5, Tr. 196, PAGEID #: 247). The ALJ's decision became final when the Appeals Council denied review on March 15, 2017. (Doc. 11-2, Tr. 1, PAGEID #: 49).

Plaintiff filed this action on May 12, 2017 (Doc. 1-2), and the Commissioner filed the administrative record on July 24, 2017 (Doc. 11). Plaintiff filed a Statement of Specific Errors (Doc. 16), the Commissioner responded (Doc. 17), and no reply was filed.

### B. Relevant Testimony at the Administrative Hearing

At the hearing, Plaintiff explained that he suffered from multiple disc herniations in his back, a fractured vertebra, deteriorated discs and vertebra in his spine, arthritis throughout his joints and spine, and fibromyalgia, all of which prevented him from working. (Doc. 11-2, Tr. 35–36, PAGEID #: 83–84). Plaintiff testified that he began having back trouble in 1988, after he fell and fractured his back while working as a tank mechanic for the U.S. Army. (*Id.*, Tr. 36, PAGEID #: 84). Plaintiff testified, however, that he continued working in that role for five years following the accident and did not stop working until November 3, 2010, after he was laid off from his job as a machine operator at Mills Pride. (*Id.*, Tr. 32–33, 38, PAGEID #: 80–81, 86). As a machine operator, Plaintiff's job involved lifting up to 80 to 90 pounds. (*Id.*). Plaintiff also testified that while on unemployment disability, he applied for jobs in 2012 that required lifting, including at a machine shop and postal service, but was unable to find employment. (*Id.*, Tr. 55, PAGEID #: 103).

When asked about his physical limitations, Plaintiff testified that he could walk a half of a mile, but would require sitting and resting both before and after walking. (*Id.*, Tr. 42, PAGEID #: 90). Plaintiff estimated that he could lift 10 to 15 pounds without experiencing stress in his neck and back, stand for 5 to 10 minutes at a time, and sit for 30 to 45 minutes at a time. (*Id.*). As treatment for his back pain, Plaintiff reported using morphine daily, which made his pain "tolerable." (*Id.*, Tr. 45, PAGEID #: 93).

In terms of daily activities, Plaintiff testified that he spends his time during the day doing "light household chores" such as sweeping the floors and "light vacuuming." (*Id.* Tr. 52, PAGEID #: 100). Plaintiff further stated that he prepares simple meals, grocery shops, and can drive for about 20 to 30 minutes at a time. (*Id.*, Tr. 46, PAGEID #: 94). Plaintiff also testified that he loved to hunt and fish, but hunts and fishes considerably less than he used to because of pain he experiences after both activities. (*Id.*, Tr. 63, PAGEID #: 111). Plaintiff had, however, gone hunting the preceding Saturday for a couple of hours. (*Id.*, Tr. 57, 63, PAGEID #: 104, 111).

As to Plaintiff's mental health, he testified that he takes Cymbalta for mood issues and irritability. (*Id.*, Tr. 47, PAGEID #: 95). He also reported troubles with his short-term memory and ability to get along with coworkers. (*Id.*, Tr. 51, PAGEID #: 99).

During the hearing, a vocational expert ("VE") opined that, although Plaintiff could not perform past work, he could perform a number of "light work" positions, including that of a routing clerk and car wash attendant. (*Id.*, Tr. 66, PAGEID #: 114).

### C. Relevant Medical Background

From 2011 to 2015, Plaintiff sought treatment for various ailments, including back, neck, and joint pain, at multiple Veterans Affairs Medical Centers around Central and Southwest Ohio. (*See generally* Docs. 11-2, 11-7). Plaintiff was diagnosed with various back and spinal cord conditions, including degeneration of discs in his lumbosacral and cervical vertebraes. (Doc. 11-7, Tr. 326, PAGEID #: 379).

On June 6, 2011, Plaintiff saw Dr. Susan Ware for a neurosurgery consultation, during which Dr. Ware noted that Plaintiff had a smooth, even gait and was able to walk on his heels

and toes without difficulty. (*Id.*, Tr. 290, PAGEID #: 343).

In December 2013, Plaintiff began seeing Dr. Arthur Thalassinos, M.D. (Doc. 11-11, Tr. 1370, PAGEID #: 1427). Plaintiff saw Dr. Thalassinos intermittently from December 2013 to September 2015, often complaining of an irritable mood, as well as neck and back pain. (Doc. 11-10, Tr. 1057, 1238, PAGEID #: 1113, 1294).

On September 18, 2015, Dr. Thalassinos completed a Mental Impairment Questionnaire and listed Plaintiff's diagnoses as mood disorder due to his back pain, as well as obesity and degenerative disc disease. (Doc. 11-11, Tr. 1370, PAGEID #: 1427). Dr. Thalassinos evaluated Plaintiff's GAF at 70, listed his prognosis as stable, noted that Plaintiff denied having any of the 19 psychiatric symptoms listed, and stated that Plaintiff's medications did not create any adverse side effects. (*Id.*). Further, Dr. Thalassinos wrote "[d]o not know" in response to how often he anticipated Plaintiff would be absent from work each month. (*Id.*).

Concerning Plaintiff's mental residual functional capacities, Dr. Thalassinos noted two "marked limitations;" namely, (1) Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, and (2) Plaintiff's ability to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*, Tr. 1371–72, PAGEID #: 1428–29). The other responses on the questionnaire, however, indicated that Plaintiff suffered only mild limitations in his ability to maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted; interact appropriately with the general public; get along with coworkers or peers without exhibiting behavioral extremes; accept instruction and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards

4

of neatness and cleanliness; sustain an ordinary routine without special supervision; understand, remember, and carry out very short and simple instructions; and respond appropriately to changes in a routine work setting. (*Id.*). Dr. Thalassinos additionally opined that Plaintiff had moderate impairment in performing activities without a schedule, maintaining regular attendance and being punctual within customary tolerances, as well as responding appropriately to changes in a routine work setting. (*Id.*). In terms of functional limitations that existed as a result of Plaintiff's mental impairments, Dr. Thalassinos stated that Plaintiff had only mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. (*Id.*, Tr. 1372, PAGEID #: 1429).

On June 10, 2013, Dr. Frank Orosz, Ph.D., a state agency consultant, found that Plaintiff had mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Doc. 11-3, Tr. 78, PAGEID #: 127). Dr. Katherine Fernandez, Psy.D., also a state agency consultant, affirmed Dr. Orosz's assessment on October 25, 2015. (*Id.*, Tr. 93, PAGEID #: 142).

### D. The ALJ's Decision

The ALJ found Plaintiff had the following severe impairments: lumbar and cervical degenerative disc disease, fibromyalgia, carpal tunnel syndrome, obesity, and affective disorder. (Doc. 11-2, Tr. 13, PAGEID #: 61). The ALJ held, however, that there was no medical opinion of record to indicate the existence of an impairment or combination of impairments that met or equaled in severity the level of the Listings of Impairments. (*Id*.).

Specifically, the ALJ concluded that Plaintiff's mental symptomatology did not result in

5

marked or extreme functional limitations in the areas of activities of daily living, social functioning, concentration/persistence/pace, or episodes of decompensation as required in "paragraph B" of Listing 12.04 or Listing 12.06. (*Id.*, Tr. 14, PAGEID #: 62). Rather, the ALJ found: Plaintiff had "mild" restriction in activities of daily living, as he was able to maintain personal care, perform household chores, grocery shop, drive, and hunt as a hobby; Plaintiff had mild difficulties in social functioning, as he reported spending time with friends and grandchildren, and although he alleged difficulty getting along with coworkers, his mental status examinations repeatedly describe him as cooperative and made no mention of such difficulty; Plaintiff had moderate difficulties with regard to concentration, persistence, or pace based on his allegations of difficulty with short-term memory, concentration, completing tasks, and handling stress; and Plaintiff had not experienced any extended episodes of decompensation. (*Id.*, Tr. 14–15, PAGEID #: 62–63). Thus, the ALJ held that Plaintiff did not satisfy the "paragraph b" criteria. (*Id.*).

As to Plaintiff's RFC, the ALJ opined:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following limitations: he is limited to unskilled work. He can occasionally stoop, kneel, couch, or crawl. He can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps or stairs. He should avoid exposure to hazards, such as heights or machinery with moving parts. He can frequently handle and finger with the upper extremities. He cannot perform production rate pace work. He can tolerate occasional changes in a routine workplace setting.

(*Id.*, Tr. 15–16, PAGEID #: 63–64). To come to this conclusion, the ALJ relied, in part, on the fact that Plaintiff was able to perform household chores at a slowed pace, including washing dishes and doing laundry, prepare simple meals, grocery shop, drive for 20 to 30 minutes at a time, and hunt as a hobby. (*Id.*, Tr. 16–17, PAGEID #: 64–65).

The ALJ ultimately determined that, although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*). In so finding, the ALJ explained that the objective medical evidence of record was inconsistent with Plaintiff's subjective allegations of pain and limitation, and that the examinations of record were largely unremarkable. (*Id.*). For example, although MRIs of Plaintiff's thoracic and lumbar spine in May and June 2011 revealed central disc protrusions at T6-7 and T9-10, resulting in mild to moderate central spinal canal narrowing and degenerative disc disease in the L3-4, L4-5, and L5-S1 levels (Doc. 11-7, Tr. 284, 292, PAGEID #: 237, 346), Plaintiff's subsequent medical records documented a smooth, even gait, as well as negative Romberg and an ability to walk on heels and toes without difficulty. (*Id.*, Tr. 290, PAGEID #: 343). Medical records from August 2013 also documented excellent muscle tone, normal reflexes, and the ability to ambulate without assistance, despite Plaintiff's complaints of chronic neck and back pain with radiation to the hips and legs. (Doc. 11-8, Tr. 576, PAGEID #: 631). In March 2014, Plaintiff also ambulated with a normal gait and was able to maintain good form while using a treadmill and weight machines. (Doc. 11-10, Tr. 1140, PAGEID #: 1196).

Additionally, the ALJ explained that, although Plaintiff complained of back and neck pain and exhibited some decreased range of motion, the remainder of his examinations were generally negative. (Doc. 11-2, Tr. 18, PAGEID #: 66). For example, medical records from March 2015 show that, despite his complaints, Plaintiff maintained normal motor strength and intact sensation and his forward bending, Valsalva Maneuver, Minor's sign, Bragard's Sign, and Erichsen's sign, among several others, were all negative. (*Id.*, Tr. 933–34, PAGEID #: 989–90).

7

Further, the ALJ stated that Plaintiff acknowledged he generally experienced less pain with medication and had undergone relatively conservative treatment for his impairments, rather than undergoing surgery, epidural steroid injections, or other treatment modalities commonly seen with disabling impairments. (*Id.*, Tr. 17–18, PAGEID #: 65–66).

Concerning Plaintiff's mental functioning, the ALJ found that Plaintiff experienced no more than moderate mental limitation. (*Id.*, Tr. 19, PAGEID #: 67). The ALJ noted that the record showed intact concentration, as well as normal expression, affect, and thought process. (*Id.*). Further, medical records from July 2015 indicated that Plaintiff denied any psychiatric symptoms and had never required any psychiatric hospitalization or significant mental health treatment. (*Id.*). In sum, the ALJ concluded that Plaintiff's allegations of disability were generally not supported by substantial objective evidence or clinical findings. (*Id.*, Tr. 21, PAGEID #: 69).

In reaching his conclusion and in defining Plaintiff's RFC, the ALJ gave "some weight" to Dr. Thalassinos's assessment. (*Id.*, Tr. 20, PAGEID #: 68). The ALJ noted that, although Dr. Thalassinos opined that Plaintiff had marked limitations in two categories of the questionnaire, his assessment generally supported a finding of mild to moderate mental limitation. (*Id.*). Further, the ALJ explained that Dr. Thalassinos opined that Plaintiff had only mild limitation in activities of daily living, social functioning, and concentration, persistence, or pace, and he assessed a GAF score of 70, which is indicative of only "mild symptoms or limitations in functions" (*Id.*). Finally, the ALJ noted that Plaintiff denied any psychiatric symptoms and his prognosis was listed as stable. (*Id.*).

The ALJ gave "some weight" to the assessments of Drs. Orosz and Fernandez, who

opined that Plaintiff had mild to moderate mental limitation in functioning. (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III. DISCUSSION

Plaintiff alleges two errors: (1) that the ALJ erred in evaluating and assigning weight to Dr. Thalassinos's mental impairment questionnaire; and (2) that the ALJ's assessed RFC is not based on substantial evidence. (Doc. 16 at Tr. 22–25).

### A. Treating Physician

In his first statement of error, Plaintiff contends that the ALJ incorrectly evaluated Dr. Thalassinos's treating source opinion. (*Id.* at Tr. 24). Specifically, Plaintiff alleges that Dr. Thalassinos's identification of two "marked" limitations is "almost certainly consistent with a finding of disability." (*Id.* at Tr. 23). Thus, although Plaintiff concedes that the ALJ "clearly

was not required to adopt (or even grant 'great weight') to Dr. Thalassinos's opinion," Plaintiff avers that the ALJ failed to provide substantive reasons for why he did not "plac[e] any stock" in the marked limitations identified by Dr. Thalassinos. (*Id.* at Tr. 24).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted). However, "an ALJ may properly reject a treating physician's opinion that does not meet these standards." *Mixon v. Colvin*, 12 F. Supp. 3d 1052, 1063–64 (S.D. Ohio 2013) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529–31 (6th Cir. 1997)).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that

10

> his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Here, the ALJ gave "some weight" to Dr. Thalassinos's assessment, acknowledging that although Dr. Thalassinos found that Plaintiff had "marked" limitations completing a normal workweek and performing at a consistent pace, the remainder of "his assessment generally supports a finding of moderate to mild mental limitation." (Doc. 11-2, Tr. 21, PAGEID #: 68). Plaintiff argues that Dr. Thalassinos's identification of two "marked" limitations is "almost certainly consistent with a finding of disability" (*Id.*, Tr. 23, PAGEID #: 1486), but this misses the point. While it may be true that marked limitations in those two areas would be consistent with a finding of disability, the ALJ assigned the opinion only "some weight," and provided good reasons for doing so.

For example, the ALJ explained that Dr. Thalassinos assessed a GAF score of 70, which indicated only mild symptoms or limitations in functioning. *See also Foreman v. Colvin*, No. 1:12CV2120, 2013 WL 3200615, at *11 (N.D. Ohio June 24, 2013) ("a GAF score between 61–70 indicates 'some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household) but generally functioning pretty well, has some meaningful interpersonal

relationships.'") (citing DSM–IV at 34)). Further, in opining on functional limitations resulting from Plaintiff's mental impairments, Dr. Thalassinos stated Plaintiff had only mild impairments in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Finally, the ALJ relied on the fact that Dr. Thalassinos ultimately listed Plaintiff's prognosis as stable and the fact that he had denied any psychiatric symptoms at his last appointment. Thus, the ALJ provided good reasons—that Dr. Thalassinos's other findings supported only mild limitations in functioning—for assigning this part of Dr. Thalassinos's opinion less than controlling weight.

In sum, the ALJ's review and analysis of Dr. Thalassinos's mental health questionnaire constitutes sufficient detail to satisfy the good-reasons requirement and appropriately explained the disposition of the case to Plaintiff. *See Barncord v. Comm'r of Soc. Sec.*, No. 2:16-CV-389, 2017 WL 2821705, at *6 (S.D. Ohio June 30, 2017). The ALJ followed the two-step analysis created by the Sixth Circuit, as his findings and reasoning regarding Dr. Thalassinos's opinion were supported by substantial evidence.

## B. The ALJ's Formation of the RFC

"A person's RFC is the most that an individual can do despite all physical and mental limitations." *Collins v. Comm'r of Soc. Sec.*, 179 F. Supp. 3d 767, 771 (S.D. Ohio 2016) (citing 20 C.F.R. § 404.1545(a)(1). In his Statement of Errors, Plaintiff contends that the ALJ's assessed RFC is not based on substantial evidence, and all of the major premises on which the ALJ relied are to some degree flawed. (Doc. 16, Tr. 25, PAGEID #: 1488). Plaintiff thus argues that the "accumulation of these flaws must lead to a finding that the ALJ's assessed RFC is not based on substantial evidence." (*Id.*). Specifically, Plaintiff states that the ALJ declined to adopt

12

a more restrictive RFC "based primarily on 6 premises:" (1) the ALJ's determination that Plaintiff's physical examination findings were predominately unremarkable; (2) Plaintiff's testimony that his pain complaints improved with medication; (3) the ALJ's determination that no physical findings corroborated a diagnosis of fibromyalgia; (4) the fact that Plaintiff received only conservative treatment for his medical impairments; (5) the ALJ's determination that Plaintiff's activities of daily living were inconsistent with a more restrictive RFC; and (6) the fact that Plaintiff stopped working for non-disability related reasons. (*Id.*).

Plaintiff then discusses each premise separately to argue why the ALJ's reasons do not support the RFC. Plaintiff fails to recognize, however, that the Social Security Act and agency regulations require an ALJ to determine a claimant's RFC based on the evidence *as a whole*. 42 U.S.C. § 423(d)(5)(B), 1382c(a)(3)(H)(i)(incorporating § 423(d) for Title XVI). Indeed, an ALJ is charged with evaluating numerous factors in determining the RFC, including the medical evidence (not limited to medical opinion testimony), and the claimant's testimony. *See Henderson v. Comm'r of Soc. Sec.,* 2010 WL 750222, at *2 No. 1:08-cv-2080 (N.D. Ohio March 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.,* 368 F.3d 629, 633 (6th Cir. 2004); Social Security Ruling 96-5p; Social Security Ruling 96-8p). Thus, this Court determines whether substantial evidence supports the RFC when looking at the record as a whole—rather than a piecemeal interpretation. But even considering each of Plaintiff's points in turn, the Undersigned finds them unpersuasive.

Plaintiff first argues that the ALJ's determination that Plaintiff's physical examination findings were predominantly unremarkable is flawed because the ALJ "fails to refer to a great deal of abnormality noted on exam within the records." (Doc. 16 at 25). The ALJ's decision,

however, shows that he properly considered and cited to both normal and abnormal exam findings in the record. For example, the ALJ noted that an MRI of Plaintiff's lumbar spine showed degenerative disc disease of the lower spine. (Doc. 11-2, Tr. 17, PAGEID #: 65). But, the ALJ ultimately relied on other findings, such as those that documented Plaintiff's smooth, even gait and ability to walk on heels and toes without difficulty. (*Id.*; *see also* Doc. 11-7, Tr. 290, PAGEID #: 343 (medical records documenting Plaintiff's ability to walk on his heels and toes "without difficulty"); Doc. 11-8, Tr. 576, PAGEID #: 630 (records noting Plaintiff's "excellent muscle tone" and that he could ambulate without assistance)). Further, Plaintiff himself estimated that he could lift 10 to 15 pounds without experiencing stress in his neck and back, which is consistent with a light work RFC. Moreover, it is well-settled in the Sixth Circuit, that an "ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (citing *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). Thus, despite not citing every abnormal note in the 1,100-page medical record, the ALJ considered both normal and abnormal findings and appropriately resolved conflicts in the medical evidence.

Plaintiff contends in his second and fourth points that although he experienced some improvement in his symptoms and received predominately conservative treatment, he remains substantially limited in his functioning. (Doc. 16 at 26–27). While that may be at least somewhat true, pain improvement with medication and conservative treatment both undermine Plaintiff's complaints of disabling pain and his argument for a more restrictive RFC. *See, e.g.*,

*McKenzie v. Comm'r of Soc. Sec.*, No. 99-3400, 2000 WL 687680 *4 (6th Cir. 2000) (Plaintiff's non-aggressive treatment undermined his complaints of disabling pain.); *Lester v. SSA*, 596 F. App'x 387 (6th Cir. 2015) (holding that treating source physician opinion that Plaintiff had significant work-related functional limitations properly discounted due, in part, to Plaintiff's receipt of conservative treatment). Consequently, the ALJ did not err in noting Plaintiff's relatively conservative treatment—namely that he did not require surgical intervention, consistent use of a TENs unit, epidural steroid injections, the use of an assistive device, or "any other treatment modality commonly seen with disabling impairments—and the fact that he reported "fair to excellent pain management." (Doc. 11-2, Tr. 18, PAGEID #: 66).

Plaintiff argues in his third premise that "the ALJ's reliance on a lack of objective testing or signs to support [Plaintiff']s impairment is [] erroneous," because impingement signs have no relation to a fibromyalgia diagnosis. (Doc. 16 at Tr. 27). While the ALJ did note that there was no indication in the record regarding positive impingement signs (*see* Doc. 11-2, Tr. 18, PAGEID #: 66), it is unclear what error Plaintiff believes occurred because despite no positive impingement signs, the ALJ still found that Plaintiff's fibromyalgia constituted a severe impairment. Moreover, Plaintiff fails to offer any additional limitations, or cite to any document in the record explaining a limitation, that should have been incorporated into the RFC based on Plaintiff's fibromyalgia.

In his fifth and sixth points, Plaintiff avers that the ALJ failed to provide "an accurate account" of his activities and improperly considered why Plaintiff stopped working. (Doc. 16 at Tr. 28). The record, however, is littered with reports of daily activities that are inconsistent with a finding of disability. The ALJ found as follows:

> The claimant's allegations about the severity of his physical and mental impairments are inconsistent with his own reports of activities of daily living. Treatment records dated March 2014 notes the claimant was independent in his activities of daily living (8F/354). In his Function Report, the claimant reported maintaining personal care and performing household chores, including doing laundry (4E/2–3). He also testified that he washes dishes and is able to prepare simple meals. He reported driving and shopping several times a week for small items as well (*Id.* at 4, testimony). He also testified that he hunts as a hobby, all of which suggest he is not as limited as alleged.

(Doc. 11-2, Tr. 20, PAGEID #: 68).

Plaintiff also testified that his daily activities included performing household chores, like sweeping and light vacuuming. Further, Plaintiff testified he did not stop working due to disability, but rather after he lost his job at Mills Pride. (*Id.*, Tr. 34–35, PAGEID #: 82–83). Thus, based on all of this, it was reasonable for the ALJ to find that Plaintiff's daily activities were inconsistent with a more restrictive RFC. *See, e.g.*, *Moses v. Comm'r of Soc. Sec.*, 402 F. App'x 43, 47 (6th Cir. 2010) (claimant's assertions of disabling pain undermined by her testimony that, with help, she sometimes washed dishes, went grocery shopping, dusted, washed laundry, and drove about three miles once a week); *Rodriguez v. Comm'r of Soc. Sec.*, No. 16-11523, 2017 U.S. Dist. LEXIS 55850, at *11 (E.D. Mich. 2017) (noting that claimant's daily activities, including cleaning, driving, shopping, and walking three city blocks demonstrated a greater RFC than alleged).

Finally, the Undersigned notes that the ALJ explicitly held that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible, and this Court must accord great deference to an ALJ's credibility assessment. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). The ALJ questioned Plaintiff's credibility, noting that the objective medical evidence of record was inconsistent with Plaintiff's

subjective allegations of pain and limitation. (Doc. 11-2, Tr. 17, PAGEID #: 65). For example, the ALJ cited medical records from August 2013 that documented Plaintiff's complaints of chronic neck and back pain, but also noted his excellent muscle tone and normal reflexes. (Doc. 11-8, Tr. 576, PAGEID #: 630). Moreover, despite Plaintiff's subjective allegations of pain, the medical record contains evidence of Plaintiff's ability to ambulate independently in 2014 and 2015 (Doc. 11-10., Tr. 1025, 1139, 1140, PAGEID #: 1081, 1195, 1196). The ALJ also emphasized that Plaintiff's credibility was further undermined by the fact that he stopped working after he lost his job—not because of any physical or mental limitations—at which time he testified that he had been lifting over 80 pounds at work, despite his claims that his back hurt while working in the army. (Doc. 11-2, Tr. 20, PAGEID#: 68). Accordingly, the ALJ had an adequate basis to discount Plaintiff's credibility, and that determination is afforded substantial deference. *See Jones*, 336 F.3d at 477.

In light of the above, the Undersigned finds that the "record as a whole"—including Plaintiff's own statements, his activities of daily living, and the medical record—contain substantial evidence to support the ALJ's RFC decision. *See Berry v. Astrue*, No. 1:09cv000411, 2010 WL 3730983, at *5 (S.D. Ohio June 18, 2010).

## IV. CONCLUSION

For the reasons stated, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 16) be **OVERRULED** and that judgment be entered in favor of Defendant.

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those

specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1). Failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: March 9, 2018                                     /s/ Kimberly A. Jolson
                                                        KIMBERLY A. JOLSON
                                                        UNITED STATES MAGISTRATE JUDGE